Norman Lloyd **PETERSEN**, Plaintiff,

v.

Ramsey **CLARK** et al., Defendants.

Civ. No. 47888.

United States District Court
N. D. California.

May 28, 1968.

See also D.C., 285 F.Supp. 693.

Doris Brin Walker, Treuhaft, Walker & Burnstein, Oakland, Cal., for plaintiff.

Cecil F. Poole, U. S. Atty., Jerry K. Cimmet, Asst. U. S. Atty., for defendants.

## ORDER · DENYING DEFENDANTS' MOTION TO DISMISS

ZIRPOLI, District Judge.

### NATURE OF THE CASE

Plaintiff filed this action seeking to enjoin his then-scheduled induction into the armed forced of the United States. He alleged that he had been illegally classified and ordered to report for induction. Basically, he set forth numerous alleged procedural errors committed by his local board in the classification process which led to the order to report for induction. Said errors, plaintiff contended, denied him due process and hence vitiated the validity of the order to report for induction.

On January 23, 1968, after this court heard oral argument and allowed plaintiff to amend the complaint, it was held that 50 U.S.C.App. § 460(b) (3), properly construed, barred a civil action to enjoin an induction on the grounds pressed by plaintiff. This court continues to be of the view that congressional intent was indeed to eliminate civil review of the validity of such orders. See Breen v. Selective Service Local Board No. 16, 284 F.Supp. 749 (U.S.Dist.Ct., D.Conn., March 13, 1968).

The order of January 23, 1968, as amended by this court's order of January 29, 1968, also ruled that plaintiff's amended complaint raised a substantial federal question appropriate for resolution by a three-judge court pursuant to 28 U.S.C. § 2282. The federal question is whether section 460(b) (3) is constitutional. A three-judge court was designated by the chief judge of this circuit. On February 20, 1968, a pretrial order was entered by this court and on March 14, 1968, this court approved a stipulation of the parties staying further proceedings in this case. The parties then believed that Oestereich v. Selective

Service System Local Board No. 11, 390 F.2d 100 (10th Cir. 1968), in which certiorari was then to have been sought, see 390 U.S. ——, 88 S.Ct. 1804, 20 L.Ed. 2d 651, raised the issue of the constitutionality of section 460(b) (3).[1] From a reading of the memorandum filed by the Solicitor General in *Oestereich*, both sides later discovered that the Supreme Court may not decide the question which is precisely presented in this case. On April 3, 1968, the defendants asked to be relieved of the stipulation and filed a motion to dismiss this action.

On January 25, 1968, plaintiff refused to submit to induction into the armed forces of the United States. On April 23, 1968, plaintiff filed a motion basically seeking injunctive relief to prevent criminal prosecution for his noncompliance with the induction order, and seeking declaratory relief that the order was invalid. The civil suit is barred if section 460(b) (3)[*] is constitutional so as to oust this court of subject matter jurisdiction to review plaintiff's classification and processing other than in a criminal case.

On April 26, 1968, oral argument was heard by the three-judge court. On May 13, 1968, after consideration by the three-judge court, it was determined that the action, insofar as it attacked the constitutionality of section 460(b) (3), did *not* necessitate a three-judge court. The three-judge court then remanded the case to this court for further consideration.

## THE MOTION TO DISMISS

The pleadings heretofore filed and the oral argument to the three-judge court clearly frame the issue in this case: Is it unconstitutional and a denial of due process for Congress to deny a person the opportunity to have civil judicial review of his selective service classification and order to report for induction in an "article-three" or "constitutional" court[2] prior to a criminal prosecution pursuant to 50 U.S.C.App. § 462?

---

1. In his memorandum in *Oestereich*, the Solicitor General argues that the issue in that case "does not necessarily involve the constitutional validity of the provision of Public Law 90–40 [which is 50 U.S.C.App. § 460(b) (3)]" because "it is possible to construe the language [of section 460(b) (3)] as applicable to the generality of situations where the local board has applied its judgment, but to exclude purported action of a board which is in fact contrary to an exemption which has been expressly granted by statute." This court finds it difficult to distinguish a congressional determination to grant exemption to ministers and ministerial students, 50 U.S.C. App. § 456(g), from a congressional determination to grant exemption to conscientious objectors, 50 U.S.C.App. § 456 (j), or, for that matter, deferments to students (by such rules and regulations as the President may prescribe), 50 U.S. C.App. § 456(i). Compare Kimball v. Selective Service Local Board No. 15, 283 F.Supp. 606 (S.D.N.Y.1968). Indeed, it is difficult to see why all the functions of Selective Service boards, including the withdrawing and terminating of deferments and exemptions, are not classification functions pursuant to the direction of Congress. Such functions involve the board's "judgment".

Cf., 50 U.S.C.App. § 456(k). In any event, there can be no "ducking" of the issue as presented in the instant case, for here the court is clearly concerned with the application of section 460(b) (3) to the "generality of situations where the local board has applied its judgment."

*No judicial review shall be made of the classification or processing of any registrant by local boards, appeal boards, or the President, except as a defense to a criminal prosecution instituted under section 12 of this title * * * after the registrant has responded either affirmatively or negatively to an order to report for induction, or for civilian work in the case of a registrant determined to be opposed to participation in war in any form * * *.

2. See Glidden v. Zdanok, 370 U.S. 530, 82 S.Ct. 1459, 8 L.Ed.2d 671 (1962); National Mut. Ins. Co. v. Tidewater Transfer Co., Inc., 337 U.S. 582, 69 S.Ct. 1173, 93 L.Ed. 1556 (1949); Williams v. United States, 289 U.S. 553, 53 S.Ct. 751, 77 L.Ed. 1372 (1933); O'Donoghue v. United States, 289 U.S. 516, 53 S.Ct. 740, 77 L.Ed. 1356 (1933); Ex parte Bakelite Corp., 279 U.S. 438, 49 S.Ct. 411, 73 L.Ed. 789 (1929).

Plaintiff contends, in effect, that Article III's grant to Congress of the power to regulate original jurisdiction of the federal courts [3] other than the Supreme Court [4] is limited by the fifth amendment's due process clause which guarantees the right to an article-three court in circumstances such as are present here.[5] This case involves the specific situation where a federal administrative agency places an individual in the position of having to either: (1) comply with an allegedly invalid order when compliance may subject him to such restraint of liberty as military service entails or (2) risk criminal prosecution to judicially test the order's validity.

A. *Congressional Power to Regulate the Jurisdiction of the Lower Federal Courts*

The United States Constitution, Article III, provides:

### ARTICLE III.—THE JUDICIARY

Section 1. The judicial Power of the United States, shall be vested in one supreme Court, and in such inferior Courts as the Congress may from time to time ordain and establish. * * *

Section 2. The judicial Power shall extend to all Cases, in Law and Equity, arising under this Constitution, the Laws of the United States, and Treaties made, or which shall be made, under their Authority;—to all Cases affecting Ambassadors, other public Ministers and Consuls;—to all Cases of admiralty and maritime Jurisdiction;—to Controversies to which the United States shall be a Party;—to Controversies between two or more States;—between a State and Citizens of another State;—between Citizens of different States;—between Citizens of the same State claiming Lands under Grants of different States, and between a State, or the Citizens thereof, and foreign States, Citizens or Subjects.

In all Cases affecting Ambassadors, other public Ministers and Consuls, and those in which a State shall be Party, the supreme Court shall have original Jurisdiction. In all the other Cases before mentioned, the supreme Court shall have appellate Jurisdiction, both as to Law and Fact, with such Exceptions, and under such Regulations as the Congress shall make.

* * *

Article III has engendered considerable and continuing debate centering on whether the Judiciary Act of 1789, 1 Stat. 73, creating lower federal courts, merely complied with the constitutional mandate that the judicial power "shall be vested" or was a gratuitous act of Congress which Congress was free to withhold or later revoke. See Wright, Federal Courts §§ 1, 10. The precise question, however, of whether Article III itself prohibits Congress from abolishing the lower federal courts is not raised in this case. The reason, of course, is that Article III is not the only guide to congressional power, for there is precedent construing the due process clauses of the fifth and fourteenth amendments and their implications concerning a right of judicial review.

3. The most extreme statement of the power is that since Article III confers the power to abolish the district courts (and courts of appeals), Congress can regulate their jurisdiction *in any manner whatsoever*. E. g., Harlan v. Pennsylvania R. R. Co., 180 F.Supp. 725 (W.D.Pa.1960).

4. Marbury v. Madison, 5 U.S. (1 Cranch) 137, 2 L.Ed. 60 (1803).

5. At oral argument, the question was raised whether a decision holding section 460(b) (3) unconstitutional would cast doubt on the validity of statutes such as 28 U.S.C. §§ 1331, 1332, each of which imposes a \$10,000 prerequisite to jurisdiction. Clearly a federal forum in the form of a constitutional court is denied to some potential litigants. This court is not persuaded that a decision respecting section 460(b) (3) carries any implications for federal question and diversity dollar limitations on jurisdiction. Dollar amounts do not confront an individual with choosing between *prison* and compliance with allegedly invalid governmental action. Only in such cases as dollar amounts might somehow create such a risk or choice would their validity be drawn in question by this decision.

At oral argument, plaintiff's counsel was asked whether Congress could abolish the United States District Courts and Courts of Appeals. The reply was a qualified "yes". The qualification was that some other (constitutional or article-three) court would have to be created in a case such as this one where an administrative body acts upon an individual in a coercive way. Counsel's answer either (1) ignored the holding in Marbury v. Madison, 5 U.S. (1 Cranch) 137, 2 L.Ed. 60 (1803), for surely original jurisdiction could not be conferred on the Supreme Court to enjoin military inductions if *Marbury* is viable; (2) implied that appellate review by the Supreme Court of a classification would suffice, such a scheme being like that held constitutional in Yakus v. United States, 321 U.S. 414, 64 S.Ct. 660, 88 L.Ed. 834 (1944); or (3) was sophistry since opting for the creation of a new, *lower* constitutional court would, in reality, be the equivalent of a "no" answer.

The thrust of plaintiff's attack on section 460(b) (3) has been that the fifth amendment's due process clause is a *limitation* on congressional power to regulate jurisdiction. If due process requires either (1) appellate review of induction orders by the Supreme Court or (2) original jurisdiction of injunction actions to enjoin inductions in lower constitutional courts, prior to the time a person could raise the defense of an order's invalidity in a criminal case, then section 460(b) (3) is unconstitutional. Even if one of the foregoing alternatives *is* required to satisfy due process, Congress is still free to abolish the lower courts if Congress would prefer to place review in the Supreme Court. Section 460(b) (3) proscribes both alternatives.

B. *Due Process and the Elimination of all Review*

Despite Article III and the argument that Congress has plenary power over jurisdiction of the federal courts, but for original jurisdiction of the Supreme Court, most authorities are singularly alike in their reluctance to agree that Congress could completely abolish judicial review in a case such as this which involves the validity of an administrative order to report for induction. For example:

> There is so much authority for the proposition that Congress is free to grant or withhold the judicial power that it might seem unnecessary to belabor the point. Yet lingering doubts remain. Wright, Federal Courts § 10.

In Lockerty v. Phillips, 319 U.S. 182, 63 S.Ct. 1019, 87 L.Ed. 1339 (1942), involving congressional power to vest special courts with power over Emergency Price Control Act disputes, the Court declared:

> The Congressional power to ordain and establish *inferior courts* includes the power "of investing them with jurisdiction either limited, concurrent, or exclusive, and of withholding jurisdiction from them in the exact degrees and character which to Congress may seem proper for the public good."

Yet the Court specifically reserved the question whether a prohibition of *all* relief would be constitutional. In Yakus v. United States, 321 U.S. 414, 64 S.Ct. 660, 88 L.Ed. 834 (1944), the Court upheld a scheme which provided, as the only review in a constitutional court, an appeal to the Supreme Court from an administrative determination. The scheme went so far as to be the exclusive means of review. If a person by-passed his appeal, he was prohibited from raising his defenses even in a criminal case. The Court said:

> There is no constitutional requirement that that test be made in one tribunal rather than in another, so long as there is an opportunity to be heard and for judicial review which satisfies the demands of due process * * *. 321 U.S. at 444, 64 S.Ct. at 677.

A leading commentator has declared:

> [T]he "Congressional power to ordain and establish inferior federal courts includes the power 'of investing them with jurisdiction * * * in the exact degrees and character which to Congress may seem proper. * * *'"

Certainly this latter proposition is generally true, although theories as to * * * due process * * * may constitute peripheral qualifications upon the otherwise unlimited power of Congress to withdraw, curtail or in some other manner qualify a jurisdictional grant. Moore, Federal Practice ¶ 0.60[2].

At least one court of appeals has asserted:

> We think * * * that the exercise by Congress of its control over jurisdiction is subject to compliance with at least the requirements of the Fifth Amendment. That is to say, while Congress has the undoubted power to give, withhold, and restrict the jurisdiction of courts other than the Supreme Court, it must not so exercise that power as to deprive any person of life, liberty, or property without due process of law * * *. Battaglia v. General Motors Corp., 169 F.2d 254, 257 (2d Cir. 1948).

■ Congress surely cannot dilute or abrogate existing constitutional guarantees in the guise of exercising its authority to vest, withhold or restrict the judicial power of inferior courts. If section 460(b) (3) had provided for *no* review even in a criminal trial, the issue would be presented squarely of whether Congress could eliminate all review of the administrative action. If Congress can eliminate all review, then *a fortiori* section 460(b) (3) would be constitutional.

This court is not unmindful of the proposition that

> The very nature of due process negates any concept of inflexible procedures universally applicable to every imaginable situation. * * * " '[D]ue process,' unlike some legal rules, is not a technical conception with a fixed content unrelated to time, place and circumstances." * * *

As these and other cases make clear, consideration of what procedures due process may require under any given set of circumstances must begin with a determination of the precise nature of the government function involved as well as of the private interest that has been affected by governmental action. * * * Cafeteria & Restaurant Workers Union Local 473 v. McElroy, 367 U.S. 886, 895, 81 S.Ct. 1743, 1748, 6 L.Ed.2d 1230 (1961).

Mr. Justice Frankfurter, concurring in Joint Anti-Fascist Refugee Committee v. McGrath, 341 U.S. 123, 162–163, 71 S.Ct. 624, 643, 95 L.Ed. 817 (1951), declared:

> "[B]y 'due process' is meant one which, following the forms of law, is appropriate to the case, and just to the parties to be affected. It must be pursued in the ordinary mode prescribed by the law; it must be adapted to the end to be attained; and wherever it is necessary for the protection of the parties, it must give them an opportunity to be heard respecting the justice of the judgment sought." * * * "Whether acting through its judiciary or through its legislature, a State may not deprive a person of all existing remedies for the enforcement of a right, which the State has no power to destroy, unless there is, or was, afforded to him some real opportunity to protect it." * * *

The requirement of "due process" is not a fair-weather or timid assurance. It must be respected in periods of calm and in times of trouble; it protects aliens as well as citizens. But "due process", unlike some legal rules, is not a technical conception with a fixed content unrelated to time, place and circumstances. Expressing as it does in its ultimate analysis respect enforced by law for that feeling of just treatment which has been evolved through centuries of Anglo-American constitutional history and civilization, "due process" cannot be imprisoned within the treacherous limits of any formula. Representing a profound attitude of fairness between man and man, and more particularly between the individual and government, "due process" is compounded of history, rea-

son, the past course of decisions, and stout confidence in the strength of the democratic faith which we profess. Due process is not a mechanical instrument. It is not a yardstick. It is a process. It is a delicate process of adjustment inescapably involving the exercise of judgment by those whom the Constitution entrusted with the unfolding of the process.

The notion that *some* review of administrative action which operates in a coercive way on an individual is essential to due process has found expression in Supreme Court decisions dealing with administrative functions other than Selective Service and manpower mobilization. For example, in the case of American School of Magnetic Healing v. McAnnulty, 187 U.S. 94, 23 S.Ct. 33, 47 L.Ed. 90 (1902), the Court held that where the Postmaster General illegally excluded letters from the mails by administrative order, a citizen could resort to the courts. The Court more or less assumed that some inherent judicial power existed. Thirty-four years later, the Supreme Court more explicitly stated the justification for judicial review. In a case where judicial review was sought of maximum rates for various services that stockyards rendered, such rates being fixed by the Secretary of Agriculture, the Court said:

> But to say that their findings of fact may be made conclusive where constitutional rights of liberty and property are involved, although the evidence clearly establishes that the findings are wrong and constitutional rights have ben invaded, is to place those rights at the mercy of administrative officials and seriously to impair the security inherent in our judicial safeguards. * * * Under our system there is no warrant for the view that the judicial power of a competent court can be circumscribed by any legislative arrangement designed to give effect to administrative action going beyond the limits of constitutional authority. St. Joseph Stock Yards Co. v. United

States, 298 U.S. 38, 52, 56 S.Ct. 720, 726, 80 L.Ed. 1033 (1936).

Concurring in *St. Joseph*, Mr. Justice Brandeis stated:

> [I]n deciding when, and to what extent, finality may be given to an administrative finding of fact involving the taking of property, the Court has refused to be governed by a rigid rule. It has weighed the relative values of constitutional rights, the essentials of powers conferred, and the need of protecting both. 298 U.S. at 81, 56 S.Ct. at 738.

> The supremacy of law demands that there shall be opportunity to have some court decide whether an erroneous rule of law was applied and whether the proceeding in which facts were adjudicated was conducted regularly. To that extent, the person asserting a right, whatever its source, should be entitled to the independent judgment of a court on the ultimate question of constitutionality. But supremacy of law does not demand that the correctness of every finding of fact to which the rule of law is to be applied shall be subject to review by a court. 298 U.S. at 84, 56 S.Ct. at 740.

In this circuit, the Court of Appeals has stated, "[E]ven final action of an administrative agency, although declared unappealable by legislation, has always been subject to attack in court if fundamentals were violated." Bustos-Ovalle v. Landon, 225 F.2d 878, 880 (9th Cir. 1955). (The quote is dictum, as the case involved an alien's attempted review of an administrative order permitting him to depart the country voluntarily. The court's holding denied review on the ground that administrative remedies had not been exhausted.)

In the landmark case of Ex parte Young, 209 U.S. 123, 28 S.Ct. 441, 52 L. Ed. 714 (1908), an issue was whether Minnesota, through an administrative agency, could prescribe rates that railroads could charge for tickets and impose, in the event of an unsuccessful at-

tack after violating the rates, a fine or imprisonment. The Supreme Court declared:

> The company, in order to test the validity of the acts, must find some agent or employee to disobey them at the risk stated. The necessary effect and result of such legislation must be to preclude a resort to the courts * * * for the purpose of testing its validity. The officers and employees could not be expected to disobey any of the provisions of the acts or orders at the risk of such fines and penalties being imposed upon them, in case the court should decide that the law was valid. The result would be a denial of any hearing to the company. 209 U.S. at 146, 28 S.Ct. at 448.

> \* \* \* \* \* \*

> We hold, therefore, that the provisions of the acts relating to the enforcement of the rates, either for freight or passengers, by imposing such enormous fines and possible imprisonment as a result of an unsuccessful effort to test the validity of the laws themselves, are unconstitutional on their face * *. 209 U.S. at 148, 28 S.Ct. at 449.

It is true that Ex parte Young was dealing with state, not federal, action and hence with the fourteenth, not the fifth, amendment. Whether every violation of the fourteenth amendment would also constitute a violation of the fifth amendment [6] need not be decided, for there is extant authority that insofar as the finality of federal administrative orders is concerned, *some* judicial review, at least of the procedural regularity of the administrative determination, is necessary at some time. In addition to the cases cited above, language in Yakus v. United States, 321 U.S. 414, 64 S.Ct. 660, 88 L.Ed. 834 (1944), implies that there is a right to some review:

> There is no constitutional requirement that that test be made in one tribunal rather than in another, so long as there is an opportunity to be heard and for judicial review which satisfies the demands of due process * * *. 321 U.S. at 444, 64 S.Ct. at 677.

and

> The petitioners are not confronted with the choice of abandoning their businesses or subjecting themselves to the penalties of the Act before they have sought and secured a [full review and] determination of the Regulation's validity. 321 U.S. at 438, 64 S.Ct. at 674.

In *Yakus*, the issue was whether, in determining the validity of price control legislation, Congress could require review of orders in a special legislative or article-one court with appellate review to the Supreme Court as the exclusive mode of review, even to the exclusion of review in a criminal proceeding. The Supreme Court answered in the affirmative. And even as to factual finality, there is some doubt as to the power of Congress to make administrative determinations final. In addition to the cases cited above, in Crowell v. Benson, 285 U.S. 22, 52 S.Ct. 285, 76 L.Ed. 598 (1932), the Court held that where a person's compensation recovery hinged on whether he was an employee working in interstate commerce, the administrative findings could not be given finality. Deeming the facts to be "constitutional", the Court said:

> [if] Congress may substitute for constitutional courts, in which the judicial power of the United States is vested, an administrative agency * * * for the final determination of the existence of the facts upon which the enforcement of the constitutional rights of the citizen depend * * * [t]hat would be to sap the judicial power as it exists under the Federal Constitution, and to establish a government of a bureaucratic character alien to our system, wherever fundamental rights depend, as not infrequently they do depend, upon the facts, and finality as to facts becomes in effect finality in law. 285 U.S. at 56–57, 52 S.Ct. at 294.

6. Cf., Bolling v. Sharpe, 347 U.S. 497, 74 S.Ct. 693, 98 L.Ed. 384 (1954).

In his treatise on administrative law, Professor Davis collects the cases dealing with this question of whether all review could be foreclosed (which he terms the question of "unreviewability") and concludes:

> When we line up the unreviewability cases on a scale, with rights in the nature of benefits at one end and obligations imposed through the governmental program at the other end * * we find that most of the cases are bunched near the benefit end of the scale, and we find not a single clear-cut authority for unreviewability at the obligation end of the scale. * * 4 Davis, Administrative Law § 28.19 (p. 104).

\*   \*   \*   \*   \*   \*

The conclusion seems to be justified that not a single case upholding unreviewability is an entirely satisfactory authority in support of the idea that due process permits denial of review of questions of law, procedure, and substantial evidence when the party seeking review is resisting enforcement of a legal obligation. Id. § 28.19 (p. 106).

Perhaps questioning the propriety or constitutionality of unreviewability in the selection service context, the Supreme Court, in Estep v. United States, 327 U.S. 114, 56 S.Ct. 423, 90 L.Ed. 567 (1946), refused to construe the word "final" as meaning that no judicial review was permitted. Although draft board classifications were to be final, the Court held that judicial review in the criminal case was not meant to be precluded.[7] See 327 U.S. at 120, 66 S.Ct. 423.

Mr. Justice Murphy, concurring, was explicit: "[J]udicial review of some sort and at some time is required by the Constitution * * *." 327 U.S. at 130, 66 S.Ct. at 431. Further, "As long as courts are open and functioning judicial review is not expendable." 327 U.S. at 132, 66 S.Ct. at 432.

■ This court can perceive no significant difference between giving finality to a state administrative order and a federal administrative order where either order requires compliance or criminal prosecution. The court concludes that Congress cannot make selective service induction orders *un*reviewable. Due process is offended by an administrative order which demands compliance or a term of imprisonment. One commentator has recalled "Hamilton's insight that limitations on governments are not worth a fig without courts to enforce them." [8]

The question then remains *whether section 460(b) (3) is constitutional in confining review to the criminal prosecution.*

## C. *Due Process and the Timing of Judicial Review*

Having concluded that *some* judicial review [9] of an order to report for induction is required by due process, the court notes that section 460(b) (3) *does* provide for review, but only at a criminal prosecution for violating the order.[10] Plaintiff contends that conditioning ju-

7. See 56 Calif.L.Rev. 448 (1968), dealing with legislative considerations and policy in limiting review. The commentator explicitly declined to deal with the constitutional question involved in this case.
   Not directly involved in this case is the constitutional question of what scope of review is essential to due process; that is to say, the continuing vitality of Estep v. United States, 327 U.S. 114, 66 S.Ct. 423 (1946).

8. Currie, The Three-Judge District Court in Constitutional Litigation, 32 U.Chi. L.Rev. 1, 9 (1964). See also Ohio Bell Telephone Co. v. Public Utilities Com-

mission of Ohio, 301 U.S. 292, 57 S.Ct. 724, 81 L.Ed. 1093 (1932).

9. In an article-three or constitutional court.

10. The statute—section 460(b) (3)—may even be read to preclude review by habeas corpus after induction into the armed forces. No decision of which this court is aware has so construed it. Neither party in this case suggests such an interpretation to be correct. At oral argument, counsel for the government conceded that if habeas corpus were precluded a serious constitutional question would be presented, U.S.Const., Art. I § 9. This opinion assumes that habeas

dicial review on compliance with the allegedly invalid order (and testing it by habeas corpus) or on risking imprisonment at a criminal prosecution should the order be found valid, is to deter many from testing the validity of orders at all, in effect provides for no hearing for some persons unwilling to risk prosecution (since the efficacy of habeas corpus is questionable [11] and, in any event, can come only after compliance with the order alleged to be invalid [12]), and hence violates due process.

Before turning to the merits, though not raised by the parties, the court feels compelled to discuss certain jurisdictional questions. The court is satisfied that a "case or controversy" exists concerning the validity of section 460(b) (3)—it precludes plaintiff from bringing a civil suit, plaintiff wants to bring a civil suit to enjoin criminal prosecution (originally to enjoin his induction), plaintiff contends the statute is unconstitutional, defendant contends the statute is constitutional. The court believes, however, that a serious question does exist whether plaintiff has "standing" to assert a constitutional defect which is based on a rationale which may have no relation to plaintiff himself. In other words, plaintiff's argument, simply stated, is that the statute precludes civil suits prior to the time he must comply with or violate the induction order. Yet

plaintiff *has already made that choice.* He chose to violate the order.

It is a well-settled principle of constitutional adjudication that when a statute is attacked as violative of the first amendment, a plaintiff may raise hypotheticals or situations other than his own to illustrate the statute's unconstitutionality.[13] It is a less well-established principle that the same rule applies in a *non*-first amendment context. The clearest illustration in which the Supreme Court *has* allowed a litigant to raise constitutional claims of others in a non-first amendment case is *Barrows v. Jackson,* 346 U.S. 249, 73 S.Ct. 1031, 97 L.Ed 1586 (1953). In *Barrows,* A, a white homeowner, sued B, a white seller of realty, alleging that B, A's former neighbor, had violated a restrictive covenant not to sell B's house to a non-white. A sought damages. The Court permitted B to raise the argument that such a covenant, if enforced, would impair the equal protection rights of non-whites seeking to purchase realty.

This court is satisfied that plaintiff may make his argument concerning the constitutionality of section 460(b) (3) for two reasons: First, *Barrows* is not materially different from this case, and since *Barrows* made it clear that the rule is neither constitutionally compelled nor forbidden, and since plaintiff did file this action at a time *prior* to the date set

---

corpus after induction *is* an available remedy.

As the Solicitor General notes in his memorandum (n. 1) in the *Oestereich* case:

Public Law 90–40 does not explicitly preserve the habeas corpus remedy. However, the law prior to 1967 (when P.L. 90–40 was adopted) clearly permitted habeas corpus as a means of testing the validity of an induction order. Witmer v. United States, 348 U.S. 375, 377, 75 S.Ct. 392, 99 L.Ed. 428; United States ex rel. Reel v. Badt, 152 F.2d 627 (C.A.2); United States ex rel. Samuels v. Pearson, 151 F.2d 801 (C.A.3). The legislative history of P.L. 90–40 makes it plain that Congress intended to preserve the generally prevailing law with respect to judicial review of Selective Service

classifications (H.Rep. No. 267, 90th Cong., 1st Sess., pp. 30–31). In addition, the statute provides for review after the registrant has responded "affirmatively" to the induction order; such review could only be by habeas corpus, since in these circumstances there would be no basis for a criminal prosecution. There would be room for doubt as to the constitutional validity of a reading of the statute which would abolish habeas corpus as a means of contesting an induction order. U.S.Constitution, Art. I. Sec. 9.

11. See 56 Calif.L.Rev. 448, 460.

12. de Rozario v. Commanding Officer etc., 390 F.2d 532 (9th Cir. 1967).

13. Cf., 55 Calif.L.Rev. 549, 557–58 nn. 73–74 and accompanying text; Wright, Federal Courts § 13.

for induction, the court thinks plaintiff should be permitted to raise the arguments referred to even though he has made his choice. Second, the court is not convinced that there is no argument which does not apply to plaintiff personally. The court is cognizant of what is at least the practice in this district where *even after indictment* if a registrant submits to induction the criminal charge is dismissed. Therefore, if plaintiff is permitted to civilly challenge the validity of the induction order and he is wrong, he may still avoid the risk of imprisonment attendant on an unsuccessful challenge.

Turning then to the question of the constitutionality of section 460(b) (3) and its deferring of judicial review to the criminal prosecution, the court will first examine certain cases dealing with administrative rate-making and provisions for judicial review.

Ex parte Young, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908), has already been discussed. In that case the United States Supreme Court held that a state rate-making scheme which permitted a test of the validity of the orders only at the risk of imprisonment if the person is wrong was unconstitutional. The language in St. Joseph Stock Yards Co. v. United States, 298 U.S. 38, 56 S.Ct. 720, 80 L.Ed. 1033 (1936), has also been quoted wherein the Supreme Court implied that finality in administrative rate-fixing was contrary to notions of due process.

In Wadley Southern Ry. Co. v. State of Georgia, 235 U.S. 651, 35 S.Ct. 214, 59 L.Ed. 405 (1915), the Court had before it a rate fixed by the state railway commission. The Court distinguished the case where if a railroad went to court to test the rate and lost, it had to pay a substantial penalty which accrued while litigating the validity. Instead the Court found that state law *did* provide for a way to test the rate without risking the penalty and held that the railroad had waived that judicial route.

A similar holding is found in St. Louis, Iron Mountain & So. Ry. Co. v. Williams, 251 U.S. 63, 40 S.Ct. 71, 64 L.Ed. 139 (1919). In both *Wadley* and *Williams* the Court strongly implied that if an unsuccessful judicial test of rates would result in penalties being imposed, as in *Ex parte Young*, the judicial review provisions would be unconstitutional. In Oklahoma Operating Co. v. Love, 252 U.S. 331, 40 S.Ct. 338, 64 L.Ed. 596 (1920), a state corporation commission determined that a laundry was a monopoly and then proceeded to regulate the laundry's rates. The only way to test the regulation was to defend a contempt proceeding for noncompliance, and an unsuccessful defense resulted in severe monetary penalties. The Supreme Court held that the scheme violated due process. See also Cotting v. Kansas City Stock Yards Co., 183 U.S. 79, 22 S.Ct. 30, 46 L.Ed. 92 (1901). Again, in Missouri Pac. Ry. Co. v. Tucker, 230 U.S. 340, 33 S.Ct. 961, 57 L.Ed. 1507 (1913), a case in which the rates could be tested only by risking substantial fines in the event of an unsuccessful challenge, the Court held the scheme unconstitutional, citing *Ex parte Young*. In Pacific Tel. & Tel. Co. v. Kuykendall, 265 U.S. 196, 44 S.Ct. 553, 68 L.Ed. 975 (1924), the Court held that federal courts could suspend penalties which were accruing pending a suit to test the validity of rates and which would be imposed in the event of an unsuccessful challenge. And in Porter v. Investors' Syndicate, 286 U.S. 461, 52 S.Ct. 617, 76 L.Ed. 1226 (1932), the Court construed a statute to mean that the effect of an administrative order would be stayed pending the institution of a test suit by an aggrieved party. Reisman v. Caplin, 375 U.S. 440, 84 S.Ct. 508, 11 L.Ed.2d 459 (1963), dealt with the provisions for judicial review of an Internal Revenue summons issued pursuant to Section 7602 of the Internal Revenue Code of 1954. A *unanimous* Court recognized the principle of *Ex parte Young* and the cases cited above. The holding in Reisman was that the judicial review provisions were constitutional because they allowed a challenge without having to choose between compliance or penalty.

An examination of the foregoing authorities, and especially the recent decision in Reisman v. Caplin, compels the conclusion that judicial review cannot be conditioned on the risk of incurring a substantial penalty or complying with an invalid order. More precisely, it should be stated that the foregoing is the conclusion in situations other than a selective service context. The court is left with the problem of balancing the interests of the government and the individual in the selective service context to see if what the government cannot do in other factual situations it may do when the governmental function involved is the raising of armies.

The court is unable to say that the financial penalties involved in most of the above cases or the risk of contempt constitute a less severe burden on the individual than the risk of imprisonment attendant upon an unsuccessful challenge of an induction order. What of the government's interest? It is certainly arguable that raising taxes and collecting rates are less important to government than mobilizing manpower for the armed forces. While this court is not competent to weigh the competing policies and necessities, it is willing to assume that the efficient operation of the selective service system is a more important function than any of the governmental functions discussed in the foregoing cases. However, since the risk to the individual is also substantial, and accrues as a result of a statute which would appear to be unconstitutional in a context other than selective service, the court must assess the consequences of a holding that the statute is unconstitutional. Due process is, of course, not an inflexible concept. The borders of due process may vary with the situation. The determination of the substance of due process in a given context must rest on an analysis of the competing interests. As has already been said, the individual's stake weighs heavily in the balancing process. If the individual chooses to contest the validity of the administrative order, and the individual is wrong, the individual finds himself convicted of a crime. The court is of the view that allowing civil review in advance of criminal prosecution would not disrupt the selective service system. The court is aware that the Solicitor General, in his memorandum (pp. 3–4) in the *Oestereich* case, declared:

> Under this statute, a registrant must either refuse induction and risk criminal prosecution, or submit to induction and seek a writ of habeas corpus, in order to obtain judicial review. While this scheme undeniably requires a registrant to incur a serious risk in order to obtain review of his draft classification, Congress has determined that the need for postponing judicial review in such situations outweighs any countervailing considerations. Public Law 90–40 was designed "to prevent litigious interruptions of procedures to provide necessary military manpower" (113 Cong.Rec. S8052 (June 12, 1967) (Sen. Russell); see Falbo v. United States, 320 U.S. 549, 551–554, 64 S.Ct. 346, 88 L.Ed. 305). Indeed, if pre-induction review were generally available, many men could be expected to bring suit in the hope of avoiding, or at least postponing, military service. Postponement of judicial review serves the national interest in preventing delays in the induction process, and the rights of the individual can be vindicated through the availability of post-induction review. Congress has thus struck a balance consistent with the Constitution.

In determining whether judicial review satisfies due process, a court cannot totally abdicate the balancing process to Congress.

Assuming civil review was available, what would the consequences be? First, assume that an individual's induction order is valid. Most likely, in a civil suit, the validity will be determined in the injunction proceeding following a brief hearing on an order to show cause. Once determined, the probabilities are that the validity will not be relitigated in the

subsequent criminal case. The individual, having obtained a judicial declaration that his order to report is valid, may submit to induction, avoiding the consequence of a criminal conviction which would have obtained had he lost his challenge in the criminal case. Alternatively, he may choose to have a trial on the issue of the wilfulness of the refusal to submit. At such a trial, the court may avoid the now necessary procedure of having to excuse the jury whenever a witness gives testimony relating to the validity of the induction order, which issue is solely for the court to decide, Martinetto v. United States, 391 F.2d 346 (9th Cir. 1968).

Therefore, the time taken in civilly adjudicating the validity of the induction order might have the following two effects: (1) the need for a few trials will be obviated by voluntary compliance with orders which have been judicially declared valid, and (2) some time will be saved at trials because the issue of the order's validity probably will not have to be litigated. The court has experienced such trials where briefs and argument on the validity of the induction order has been made both before and after the jury's verdict, with a considerable consumption of time. Second, assume the induction order is invalid. In this case, the need for calling and empanelling a jury will be completely eliminated and the court will experience a net saving in time.

Accordingly, this court believes that no substantial burden on the judiciary will be experienced by entertaining civil jurisdiction of suits to determine the validity of induction orders. Furthermore, since only the timing and not the scope of review will be affected, the number of men who will ultimately be found to have been validly classified will not be changed. Hence, no interference with the governmental function of raising of armies will result from civil jurisdiction.

Having weighed the consequences of section 460(b) (3) upon the individual, having considered the implications of a declaration that the statute is unconstitutional, and having considered the numerous authorities suggesting that such a statute would be unconstitutional in other contexts, the court holds that due process in this particular context demands that it is unconstitutional to restrict a registrant to the criminal trial forum to raise the defense that his order to report for induction was invalid because of procedural errors committed by the administrative agency in the classification process.[14]

D. *The Remedy of Habeas Corpus*

The contention is made that section 460(b) (3) is not unconstitutional because due process is satisfied by the existence of the post-induction remedy of habeas corpus. Although the efficacy of habeas corpus in the military context has been questioned,[15] this court is not of the view that section 460(b) (3) is constitutional, even assuming habeas corpus is effective.

First, one must recognize that to utilize habeas corpus one must be inducted into the armed forces.[16] Second, submitting to induction is the equivalent of compliance with the administrative order alleged to be invalid.[17] Third, the mere existence of habeas corpus as a remedy after the substantial deprivation of lib-

14. Expressly not decided herein is the question of whether, in every case, the same quantum or scope of judicial review is required. The court is here faced with a very specific situation in which a registrant must face induction or imprisonment to test the validity of his order and in which even in a criminal case the scope of review is extremely circumscribed. Hence, the risks attendant on the criminal trial are even greater than in the usual case where judicial review is permitted to invoke the substantial evidence test.

15. 56 Calif.L.Rev. 448, 460 (1968).

16. de Rozario v. Commanding Officer, etc. 390 F.2d 532 (9th Cir. 1967).

17. See American School of Magnetic Healing v. McAnnulty, 187 U.S. 94, 23 S.Ct. 33, 47 L.Ed. 90 (1902); St. Joseph Stock Yards Co. v. United States, 298 U.S. 38, 56 S.Ct. 720, 80 L.Ed. 1033

erty should not serve to abrogate the duty to prevent the damage if possible.[18] The court doubts that in a criminal trial our system of justice would tolerate, for example, the deferring of all fourth or fifth amendment claims or defenses until after a factual finding that a defendant committed certain acts and require that they be raised by way of habeas corpus after confinement.

Accordingly, the court holds that the mere existence of habeas corpus as a remedy following induction into the armed forces of the United States, does not justify the elimination of a person's due process right to judicial review of an order to report for induction without the risk of imprisonment or compliance with a potentially illegal and untested administrative order. To repeat the words of the Court in St. Joseph Stock Yards Co. v. United States, 298 U.S. 38, 52, 56 S.Ct. 720, 726 (1936):

> Under our system there is no warrant for the view that the judicial power of a competent court can be circumscribed by any legislative arrangement designed to give effect to administrative action going beyond the limits of constitutional authority.

## CONCLUSION

■ The court holds that Congress cannot deny pre-criminal judicial review in some constitutional or article-three court to review the validity of an order to report for induction into the armed forces of the United States.[19]

In finding section 460(b) (3) unconstitutional in that it denies pre-criminal and pre-compliance judicial review, this court has not impaired congressional power under Article III to restrict the jurisdiction of the lower federal courts. Congress may, for example, adopt a scheme such as was involved in the *Yakus* case where *no* review of the administrative order was available at the criminal trial. Whether such a choice would be made by Congress, this court is neither able nor competent to say. But as long as the United States District Courts do exist, as long as the fifth amendment is the law of the land, and because the authorities herein cited are the law of the land, this court feels compelled to entertain plaintiff's civil suit to determine the validity of his induction order and to determine whether an injunction against criminal prosecution is justified.

Therefore,

It is ordered that the defendants' motion to dismiss is denied.

It is further ordered that further proceedings—in the nature of an order to show cause why plaintiff's order to submit to induction should not be declared invalid and why prosecution for failure to comply therewith should not be enjoined—are stayed pending further order of this court.

It is my opinion that this order should be an appealable order pursuant to 28 U.S.C. § 1292(b) because it involves a controlling question of law—whether 50

---

(1936); Crowell v. Benson, 285 U.S. 22, 52 S.Ct. 285, 76 L.Ed. 598 (1932).

18. See Hart, The Power of Congress to Limit the Jurisdiction of Federal Courts: An Exercise in Dialectic, 66 Harv.L.Rev. 1362, 1381–83 (1953). There is also the view that as long as Congress has charged the courts with an enforcement power to criminally try persons for non-compliance with orders to report, the court ought to be able to determine the validity of said orders without jeopardizing a person's liberty. Cf., Yakus v. United States, 321 U.S. 414, 64 S.Ct. 660, 88 L.Ed. 834 (1944); Ex parte Young, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908); Reisman v. Caplin, 375 U.S. 440, 84 S.Ct. 508, 11 L.Ed.2d 459 (1964); Estep v. United States,

327 U.S. 114, 132, 66 S.Ct. 423, 90 L.Ed. 567 (Murphy, J., concurring) (1946).

19. Defendants have contended that even absent section 460(b) (3), prior case law precludes civil review in a case such as this one. This court is of the view that the opinions are not as clear as the government asserts, some being based more on the rationale that plaintiffs had not exhausted administrative remedies than on a true lack of constitutional jurisdiction. See, e. g., Breen v. Selective Service Local Board No. 16, 284 F. Supp. 749 (D.Conn.1968); compare Daniels v. United States, 372 F.2d 407 (9th Cir. 1967) (issuance of order to report for civilian work constitutes end of administrative process for purposes of raising defense at criminal trial).

U.S.C. App. § 460(b) (3) results in an unconstitutional denial of due process—as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation.