**Stephen Bruce MURRAY**

v.

**Jack Hood VAUGHN, Director of the Peace Corps., et al.**

**Civ. A. No. 4018.**

United States District Court
D. Rhode Island.

June 6, 1969.

Marvin M. Karpatkin and Michael N. Pollet, Melvin L. Wulf, New York City, Milton Stanzler, Providence, R. I., for plaintiff.

William D. Ruckelshaus, Asst. Atty. Gen., Harland F. Leathers, and John E. Shockey, Dept. of Justice, Washington, D. C., Edward P. Gallogly, U. S. Atty. for District of Rhode Island, Providence, R. I., for defendants.

## OPINION

### Motion to Dismiss

PETTINE, District Judge.

This is a civil action commenced by the plaintiff, Stephen Bruce Murray, a citizen of the United States and a resident of Rhode Island, who seeks declaratory and other equitable relief against (1) the Director of the Peace Corps, (2) the Rhode Island State Director of the Selective Service System, (3) Rhode Island Selective Service Local Board No. 3, (4) the Attorney General of the United States, and (5) the United States Attorney for the District of Rhode Island.

Jurisdiction is alleged to exist on the basis of 28 U.S.C. § 1331 and/or 28 U.S.C. § 1361. The procedural requisites of this action are governed by Rule 65. The various defendants have moved to dismiss on several grounds, all of which will be treated.

The plaintiff's complaint is in two counts, each of which sets forth separate substantive claims for relief. For purposes of clarity, I will treat the two counts separately as to both facts and law.[1]

### Count I

Plaintiff Murray, who is and has been properly registered under the Selective Service System with Rhode Island Local Board No. 3, enrolled in the Peace Corps in June of 1965. Immediately after his enrollment, Murray requested and received a II–A occupational deferment from Local Board No. 3 by reason of his Peace Corps enrollment. In October of 1965 Murray was sent by the Peace Corps to Chile where he served on the music faculty of the University of Concepcion. The normal expiration date of Murray's term in Chile would have been January of 1968, some two months after his twenty-sixth birthday.[2] However, in June of 1967 Murray was expelled from the Peace Corps by order of the Corps' Director and, by allegation, without either prior notice or a hearing, for publishing a letter in *El Sur*, a local Chilean newspaper, in which letter he criticized both U. S. foreign policy concerning the American involvement in Vietnam and Peace Corps' policy concerning the freedom of Peace Corps volunteers to criticize U. S. foreign policy. Also in June of 1967 Murray was reclassified I–A by Local Board No. 3.

Murray further points out that on November 7, 1967, he reached his twenty-

---

1. The government made reference in its brief and in the course of oral argument to Mr. Vaughn's letter of June 28, 1967 to Mr. Murray. I treat the letter as part of the government's argument for its motion to dismiss plaintiff's claim against the Peace Corps for failure to state a claim upon which relief can be granted. I, therefore, decline for this or any other purpose to treat this as a motion for summary judgment.

   Both sides made reference in oral argument to facts and inferences therefrom which do not appear clearly from a plain reading of the pleadings. I will treat this as a motion to dismiss and will resolve all ambiguities in favor of the plaintiff.

   At various junctures in the opinion, I will delineate the contours of the ambiguities which exist and will indicate whether and how I resolve them for the purpose of this motion.

2. The prospective termination date of Murray's Peace Corps appointment is alleged in the complaint to have been January, 1968. On oral argument, plaintiff's counsel stated that a Peace Corps appointment runs from the date of assignment. Here, Murray was assigned to Chile in October, 1965. His two-year appointment would, therefore, have terminated, in the normal course, in October, 1967. This does not square with the allegation in the complaint. However, likewise on oral argument, plaintiff's counsel did not state specifically when Murray's term ended, but rather generalized that it ended sometime near the end of 1967 or beginning of 1968. For purposes of this opinion, I resolve this ambiguity by honoring the allegation in the complaint.

sixth birthday. On information and belief, Murray alleges that it was the generally successful policy and practice of the Peace Corps to seek to persuade local boards and other decision-making bodies within the Selective Service System to continue II–A occupational deferment classifications for all draft registrants enrolled and serving as Peace Corps volunteers. Likewise on information and belief, Murray alleges that it was the consistent policy and practice of Local Board No. 3 to continue II–A occupational deferment classifications for all draft registrants enrolled and serving as Peace Corps volunteers, including such volunteers who reached their twenty-sixth birthdays while enrolled and serving. Murray states that he was informed of this consistent policy and practice and was advised that it would apply in his case.[3]

On September 11, 1967 Local Board No. 3 issued to Murray an order to report for induction into the armed forces on October 4, 1967. On October 16, 1967, the date to which his induction was postponed, Murray appeared at the induction station but refused to submit to induction into the armed forces. On or about January 24, 1968, Murray was indicted in the United States District Court for the District of Rhode Island for refusing to submit to induction. His case has not yet come to trial.

On the basis of these facts, Murray concludes he was expelled from the Peace Corps in violation of his First Amendment rights, for having published his views, and in violation of his Fifth Amendment rights to a hearing and notice prior to explusion as a matter of due process of the law, and in violation of his Sixth Amendment rights to confrontation of witnesses, cross-examination, and competent counsel to assist him at his expulsion proceedings. He argues further that but for his unconstitutional and illegal expulsion from the Peace Corps, he would have retained his II–A classification until the conclusion of his term of service in the Peace Corps, which would not have occurred until after his twenty-sixth birthday, and he would, therefore, not have been subject to criminal prosecution for refusal to submit to induction.

Accordingly, Murray seeks a declaration that his expulsion from the Peace Corps was unconstitutional, a mandatory injunction ordering the Peace Corps Director to cleanse his record and reinstate

---

3. On oral argument plaintiff's counsel indicated that the sequence of events involving Murray's letter, his expulsion from the Peace Corps, his reclassification I–A, and certain other events, allows two possible theoretical fact-patterns, either of which would permit pre-prosecution judicial review. Because it is necessary to treat both possibilities in order to resolve an important jurisdictional issue in this case, and because I think it wise to treat both possibilities in order to clarify the law of this case for jurisdictional purposes, I here set them out. I call the first theory the "conspiracy" theory. Under this theory it is alleged that Murray's intention to state his mind on Peace Corps policy and on United States foreign policy became known to Peace Corps personnel who determined to and did, in fact, bring about his removal from the Peace Corps and who, also, informed his local Selective Service System agency of his termination and either hinted or indicated directly that Murray should be reclassified and that the local board then did reclassify Murray I–A. I call the second theory the "inheritance" theory. Under this theory it is alleged that Murray's intention to state his mind on Peace Corps policy and on United States foreign policy became known to Peace Corps personnel who removed him from the Peace Corps when he did so state his mind. Thereupon, his local Selective Service System board inherited Murray as he then stood, that is, as an expelled Peace Corps member with a potential cause of action against the Peace Corps for violation of his First Amendment rights. Furthermore, under this theory, it is alleged that had Murray continued in Peace Corps service his local board either would not have reclassified him I–A or would have entertained and granted a *pro forma* request by him to be returned to II–A status. Hence, it is concluded, "but for" the action of the Peace Corps, Murray would have retained his II–A status, would have passed his twenty-sixth birthday, and would not have been ordered to report for induction.

694

him in the Peace Corps, a mandatory order to Local Board No. 3 to reclassify him II–A as of June, 1967, and through January, 1968, and an order prohibiting the Attorney General and the United States Attorney from continuing to prosecute him criminally.

The government moves for dismissal on these various grounds: (1) as to all the defendants the court lacks jurisdiction under either 28 U.S.C. § 1331 or 28 U.S.C. § 1361; (2) even if jurisdiction is accepted generally, as to the Peace Corps (a) the court lacks power to order an officer of the executive branch to perform discretionary acts concerning the plaintiff (b) the Peace Corps did not infringe the constitutional rights of the plaintiff, as a matter of constitutional law; (3) even if jurisdiction is accepted generally, as to the Selective Service, 50 U.S.C. App. § 460 (b) (3) is a bar to the granting of injunctive relief at this stage; (4) even if jurisdiction is accepted generally, as to the criminal prosecution, equity forbids prohibitory relief.

### 28 U.S.C. § 1331

The thrust of the defendants' position as to § 1331 is that " * * * plaintiff could not possibly show a $10,000 amount in controversy" under § 1331, "because of the very limited allowances he would receive as a Peace Corps volunteer." [4]

Unquestionably, the problem of jurisdictional amount in federal court suits involving political or economic constitutional rights is one of current concern, especially in Selective Service cases. See, e. g., Oestereich v. Selective Service System Local Board No. 11, 393 U.S. 233, 89 S.Ct. 414, 21 L.Ed.2d 402 (1968), Wolff v. Selective Service Local Board No. 16, 372 F.2d 817, 826 and n. 7 (2nd Cir. 1967), Boyd v. Clark, 287 F.Supp. 561 (S.D.N.Y.1968), judgment affirmed, but jurisdictional amount question expressly left open, 393 U.S. 316, 89 S.Ct. 553, 21 L.Ed.2d 511 (Jan. 13, 1969),

Armendariz v. Hershey, 295 F.Supp. 1351 (W.D.Texas Feb. 5, 1969).

However, there are several reasons why the defendants' arguments cannot be accepted. First, it is clear that, when an allegation of an amount in controversy in excess of $10,000 is made and controverted by the defense, the plaintiff has the opportunity to show that his claim is valid and the complaint cannot be dismissed unless it appears to a legal certainty that his claim is invalid. St. Paul Mercury Indemnity Co. v. Red Cab Co., 303 U.S. 283 at 289, 58 S.Ct. 586, 82 L.Ed. 845 (1938). Here, the government would have this court value the plaintiff's loss by his loss of Peace Corps "benefits" between the date of his severance from the Peace Corps and the date he would have terminated in the normal course. Plaintiff's loss is, under plaintiff's theory, not nearly so miniscule. He claims that he stands to lose not just his job with the Peace Corps but his freedom to earn money for that period of time during which, subsequent to his Peace Corps service, he would have been free to teach music at the then going rate. His argument is that, but for the action of the Peace Corps, he would in January of 1968 have been free to teach rather than have been compelled either to enter the armed services or to refuse induction and go to jail. Cf. Gobitis v. Minersville School Dist., 24 F.Supp. 271 (E.D.Pa.1938). While plaintiff has not submitted precise amounts in support of his claim, it is clear that he is free to so do. Moreover, Fed.R.Civ.P. 12(d) permits this court to postpone such a specific showing until trial. Because the amount alleged to be in controversy by the plaintiff is so plainly dependent on his substantive claims, cf. Bell v. Hood, 327 U.S. 678, 66 S.Ct. 773, 90 L.Ed. 939 (1946), the court hereby orders such a postponement. Accordingly, because it does not appear to a legal certainty that the amount is here lacking, the defendants'

4. Defendants' Reply Memorandum at p. 5 and n. 3.

motion is in this respect denied. See especially Zigmond v. Selective Service Local Board No. 16, 284 F.Supp. 732 at 733 (D.Mass.1968). See also Kimball v. Selective Service Local Board No. 15, 283 F.Supp. 606 at 607 (S.D.N.Y.1968). Cf. *Gobitis, supra.*[5]

There is yet another, far more serious reason why the defendants' motion to dismiss for lack of jurisdictional amount should be denied. With respect to Count 1, the plaintiff is asserting a most serious constitutional claim. Both the Fifth Amendment and Article III, § 2 of the Constitution might well be abused if no avenue is opened for review by the courts of that claim. Specifically, if there is an arguably valid constitutional claim here, and if, as the government contends, neither 28 U.S.C. § 1361 mandamus nor 28 U.S.C. § 1331 general equity jurisdiction is available, how can the plaintiff seek to vindicate his rights? Certainly, the concurrent jurisdiction of the state courts is highly questionable in this context. See Comment: Draft Reclassification for Political Demonstrations—Jurisdictional Amounts in Suits Against Federal Officers, 53 Corn.L.Q. 916 at 926 (1968). See generally Arnold, The Power of State Courts to Enjoin Federal Officers, 73 Yale L.J. 1385 (1964); 1 Moore's Federal Practice paragraph 0.6(5) at pp. 240–251; cf. Mayo v. United States, 319 U.S. 441, 445 and n. 5, 63 S.Ct. 1137, 87 L.Ed. 1504 (1943). It is, moreover, no answer to suggest that plaintiff should await a criminal prosecution for violation of the Selective Service Act in order to raise his constitutional claim against the Peace Corps. See especially Petersen v. Clark, 285 F.Supp. 700 at 703 and n. 5 (N.D.Calif.1968). Nor could the question ever be decided within the administrative apparatus of either the Selective Service System or the Peace Corps, for federal agencies have neither the power nor the competence to pass on the constitutionality of administrative or legislative action. See Oestereich v. Selective Service Local Board No. 11, 393 U.S. 233 at 242, 89 S.Ct. 414, 21 L.Ed.2d 402 and cases cited therein (Harlan, J., concurring). In summation, it is probable that if § 1331's amount in controversy proviso bars this court from reaching the merits of this case, a plaintiff, who alleges injury to those rights which occupy the highest position in the pantheon of our constitutional values, would be left without judicial process of law. As so applied, § 1331 might well be deemed to violate both the due process clause of the Fifth Amendment and Article III, § 2 of the Constitution in so far as it establishes the judicial branch of the government. See Petersen v. Clark, 285 F.Supp. 700 (N.D.Calif.1968). Boyd v. Clark, 287 F.Supp. 561 at 567 (S.D.N.Y. 1968) (Edelstein, J., dissenting), judgment aff'd. but jurisdictional amount question expressly left open, 393 U.S. 316, 89 S.Ct. 553, 21 L.Ed.2d 511 (Jan. 13, 1969); Giancana v. Johnson, 335 F. 2d 366 (7th Cir. 1964) (Swygert, J., dissenting), cert. den., 379 U.S. 1001, 85 S.Ct. 718, 13 L.Ed.2d 702 (1965). Cf. Snyder v. Harris, 394 U.S. 332, 89 S.Ct. 1053, 22 L.Ed.2d 319 n. 2 (Fortas, J., dissenting). See generally Comment: Draft Reclassification for Political Demonstrations—Jurisdictional Amounts in Suits Against Federal Officers, 53 Corn. L.Q. 916 (1968); H. Hart & H. Wechsler, The Federal Courts and The Federal System 328–340 (Foundation Press 1953).

Given the constitutional problem with § 1331 as here applied there is much to be said for the position taken by Judge Edelstein, dissenting, in Boyd v. Clark, 287 F.Supp. at 568

> This is not the nineteenth century where property rights were valued over human rights. If a man can sue in federal court on the allegation that the government is injuring his property, he certainly must be allowed to sue on the allegation that the government

5. Even the government did not "push" this ground for dismissal. Perhaps the incongruity of foreclosing the federal courts to suits of this sort tempered the government's invocation of this possible threshold defect.

is oppressing him personally. Although it might be said that human rights are incapable of valuation and hence valueless, it is better to view them as incapable of valuation but only because they are of infinite value. The latter view is, in my humble opinion, the only view compatible with the commitment of our nation to a belief in the dignity of man and the inherent worth of a free individual in a free society.

See also Judge Swygert's dissenting opinion in Giancana v. Johnson, 335 F.2d 366 (7th Cir. 1964). Hague v. CIO, 307 U.S. 496, 59 S.Ct. 954, 83 L.Ed. 1423 (1939) is not to the contrary, for there, while at least two of the Justices (Stone, J.; Reed, J.) stated that "(t)here are many rights and immunities secured by the Constitution, of which freedom of speech and assembly are conspicuous examples, which are not capable of money valuation, and in many instances, like the present, no suit in equity could be maintained for their protection if proof of the jurisdictional amount were prerequisite," 307 U.S. at 529, 59 S.Ct. at 970, nevertheless, no majority of the court joined in that view. See Snyder v. Harris, 394 U.S. 332, 89 S.Ct. 1053, 22 L.Ed.2d 319 n. 2 (Fortas, J., dissenting). Accordingly, for this reason also, the defendants' motion to dismiss is in this respect denied.

### 28 U.S.C. § 1361

The plaintiff seeks a mandatory order to the Director of the Peace Corps to cleanse plaintiff's employment records with the Peace Corps so that those records indicate that, but for the unconstitutional action of the Peace Corps and of the Selective Service System, plaintiff would have completed his term of appointment. Additionally, plaintiff seeks a mandatory order to the State Director of Selective Service and to Local Board No. 3 to reclassify plaintiff II–A from the time he was expelled from the Peace Corps to the time he would, in the normal course, have ended his term of appointment with the Corps. As to these defendants, plaintiff contends that 28 U.S.C. § 1361 is a sufficient jurisdictional predicate for the mandatory relief he seeks. These defendants argue, contrariwise, that no mandamus jurisdiction exists here because the acts sought to be reviewed, namely, termination from Peace Corps employment and classification by the Selective Service System, are "discretionary" acts, and because 28 U.S.C. § 1361 does not reach "discretionary" acts of government agents.

■■■ Unquestionably, mandamus will not compel an officer to do a "discretionary" act. Yet, the pivotal inquiry must be directed at the permissible scope of the officer's discretion, for that discretion is circumscribed by constitutional, statutory, and regulatory strictures. It has been suggested by especially qualified commentators that any act of a federal officer which exceeds his statutory or regulatory function, and which must be remedied by affirmative action, should be reviewable on the basis of the statutory mandamus jurisdiction. See Byse and Fiocca, Section 1361 of the Mandamus and Venue Act of 1962 and "Nonstatutory" Judicial Review of Federal Administrative Action, 81 Harv.L. Rev. 308 at 355 and n. 99 (1967). As was stated by Chief Justice Taft in Work v. United States ex rel. Rives, 267 U.S. 175 at 177–178, 45 S.Ct. 252, 69 L. Ed. 561 (1925)

> Mandamus issues to compel an officer to perform a purely ministerial duty. It cannot be used to compel or control a duty in the discharge of which by law he is given discretion. The duty may be discretionary within limits. He cannot transgress those limits, and if he does so, he may be controlled by injunction or mandamus to keep within them. The power of the court to intervene, if at all, thus depends upon what statutory discretion he has * * * (The) extent (of the officer's discretion) and the scope of judicial action in limiting it depend upon a proper interpretation of the particular statute and the congressional purpose.

Conceding even that the statutory and regulatory provisions governing the Director of the Peace Corps with respect to employee termination, 22 U.S.C. §§ 2503(b), 2504(i), and governing Local Board No. 3 with respect to classification, 50 U.S.C. App. § 456(h) (2), 32 C.F.R. §§ 1622.22, 1622.23, vest the Director and the Board, respectively, with discretion, nevertheless, if these defendants, in exercising that discretion, violated the constitutional rights of the plaintiff, they cannot avoid § 1361 jurisdiction. Just as federal officers are not immune from suit where they exceed their powers and violate the Constitution, so also are they susceptible of suit under § 1361 when they exceed their powers and violate the Constitution. See Walker v. Blackwell, 360 F.2d 66 (5th Cir. 1966), Long v. Katzenbach, 258 F.Supp. 89 (N.D.Pa.1966). See also 81 Harv.L.Rev., *supra* at 349. It is significant that this approach to mandamus jurisdiction to review administrative action has been exemplified in a recent, well-received, see 81 Harv.L.Rev., *supra* at 351–353, decision of the First Circuit. Ashe v. McNamara, 355 F.2d 277 (1st Cir. 1965). While the *Ashe* case is not, on its facts, wholly dispositive of the instant case, it does indicate the approach to be taken to a problem of this sort.

It should, then, be the approach of this court to examine the actions of the defendants to determine whether they transgressed plaintiff's rights under the Constitution. If they did so, then mandamus will issue as to them. In this respect, it will appear subsequently that as to Local Board No. 3, the State Director of Selective Service, and the Director of the Peace Corps, mandamus will be shown to be a sufficient jurisdictional predicate.[6] Compare Carey v. Local Board No. 2, 297 F.Supp. 252 (D. Conn. Feb. 13, 1969) with Guffanti v. Hershey, 296 F.Supp. 553 (S.D.N.Y. Feb. 24, 1969). Of course, as to the defendants Mitchell and Gallogly, mandamus

jurisdiction is lacking because the relief as to them is negative or prohibitory.

### Subject-Matter Jurisdiction and Executive Discretion

The government next argues that even if either § 1331 or § 1361 is jurisdictionally available to the plaintiff, the court lacks power to decide this controversy as to the defendant Peace Corps Director because the courts cannot interfere with the discretion of the Executive in matters involving foreign policy.

At the outset it should be made clear that Peace Corps employees do serve "at the pleasure of the President," 22 U.S.C. § 2504(i), and that the President's discretionary authority to terminate Peace Corps members has been delegated to the Director of the Peace Corps. 22 U.S.C. § 2503(b). The defense takes the broad position that a federal court has no subject matter jurisdiction to interfere with any exercise of the Executive's discretion or that of his delegee in any matter relating in any degree to United States foreign policy. This is not so where the action sought to be reviewed is claimed to violate the Constitution. The defense has not been able to cite, nor has this court, on an independent basis, been able to find a single case in support of that broad proposition. C & S Airlines v. Waterman S. S. Corp., 333 U.S. 103 at 111–112, 68 S.Ct. 431, 92 L.Ed. 568 (1948), upon which the defense relies, and which, so far as the action sought to be reviewed, involved a far more delicate discretionary decision in an area more closely related to foreign policy than this case, did not present a claim of unconstitutional conduct by the Executive. Moreover, that case was decided by the slimmest margin (5–4), with a vigorous dissent and also involved a matter of utmost importance to the Court's definition of its own function, which matter is likewise not here present. See Currie, Federal Courts p. 7 and n. 1 (West Pub-

6. See note 3, *supra*. As so often happens, the resolution of the jurisdictional question depends on the resolution of the substance of the case.

lishing Co. 1968), H. Hart & H. Wechsler, The Federal Courts and The Federal System, pp. 100–102 (Foundation Press 1953); Bickel, The Least Dangerous Branch 117 (1962).

■ It must be concluded, therefore, that federal courts have jurisdiction to consider claims that a member of the Executive branch has exercised his discretionary authority to hire and fire in such a way or pursuant to such a process as to infringe constitutional rights. The motion to dismiss is, therefore, in this respect denied.

*Subject-Matter Jurisdiction and 50 U.S.C. App. § 460(b) (3)*

With respect to the relief sought against Local Board No. 3, the Rhode Island Director of Selective Service, United States Attorney Gallogly, and Attorney General Mitchell, the defense has moved to dismiss on the ground that 50 U.S.C. App. § 460(b) (3) renders preprosecution judicial review of Murray's classification impermissible.

■ Although the relationship between the federal courts and the Selective Service System extends at least as far back as World War I, see H. Hart & H. Wechsler, The Federal Courts and The Federal System p. 325 and n. 20 (Foundation Press 1953), it is useful for purposes of providing background to the issue in this case to consider only those cases running from Falbo v. United States, 320 U.S. 549, 64 S.Ct. 346, 88 L.Ed. 305 (1944) to the present. In *Falbo*, the Court, construing the Selective Service Act of 1940 which contained no statutory statement concerning judicial review of classification, apparently held that a Selective Service registrant under criminal prosecution for failure to report to assigned work of national importance could not raise as a defense his allegedly wrongful and discriminatory classification. Subsequently, in Estep v. United States, 327 U.S. 114, 66 S.Ct. 423, 90 L.Ed. 567 (1946) the Court elaborated *Falbo* and stated that the defendant in that case had been prohibited

from raising his alleged wrongful classification in defense of his criminal prosecution only because he had failed to go to "the end of the line," that is, to exhaust the administrative process, thereby depriving the System of the opportunity to correct its allegedly wrongful classification and also thereby increasing the probability of eventual litigation by eliminating the System's opportunity to examine him further and possibly to defer or exempt him for some reason discovered during that examination process. The Court in *Estep* then went on to construe the Selective Service Act of 1940 with respect to the availability and scope of judicial review of the classification process.

We cannot believe that Congress intended that criminal sanctions were to be applied to orders issued by local boards no matter how flagrantly they violated the rules and regulations which define their jurisdiction. We are dealing here with a question of personal liberty. A registrant who violates the Act commits a felony. A felon customarily suffers the loss of substantial rights. Sec. 11, being silent on the matter, leaves the question of available defenses in doubt. But we are loathe to resolve those doubts against the accused. We cannot readily infer that Congress departed so far from the traditional concepts of a fair trial when it made the actions of the local boards "final" is to provide that a citizen of this country should go to jail for not obeying an unlawful order of an administrative agency. We are loathe to believe that Congress reduced criminal trials under the Act to proceedings so barren of the customary safeguards which the law has designed for the protection of the accused. The provision making the decisions of the local boards "final" means to us that Congress chose not to give administrative action under this Act the customary scope of judicial review which obtains under other statutes. It means that the courts are not to weigh the evidence to determine

whether the classification made by the local boards was justified. The decisions of the local boards made in conformity with the regulations are final even though they may be erroneous. The question of jurisdiction of the local board is reached only if there is no basis in fact for the classification which it gave the registrant.

The dissenters in *Estep* took the position that the availability of *habeas corpus* after either incarceration or induction precluded any necessity for judicial review of local board action at the criminal prosecution. That position was rejected by the majority. Subsequently it became settled law that one who chose to submit to induction could then raise on *habeas corpus* the allegedly wrongful conduct of his local board. See Witmer v. United States, 348 U.S. 375, 75 S.Ct. 392, 99 L.Ed. 428 (1955). The Supreme Court likewise elaborated further the scope of judicial review in Selective Service cases which subsequently reached the Court. See Cox v. United States, 332 U.S. 442, 68 S.Ct. 115, 92 L.Ed. 59 (1947), Dickinson v. United States, 346 U.S. 389, 74 S.Ct. 152, 98 L. Ed. 132 (1953), Witmer v. United States, 348 U.S. 375, 75 S.Ct. 392, 99 L.Ed. 428 (1955). The function of the courts in reviewing local board action is, on the basis of Supreme Court elaboration in *Estep, Cox, Dickinson,* and *Witmer,* to determine whether the statutory and regulatory provisions of Selective Service law are followed and to determine whether there is some basis in fact for the board's classification.

Between 1946 and 1967 the general propositions established by *Falbo, Estep, Cox, Dickinson* and *Witmer* that review of local board classification could be obtained only (1) upon following the Selective Service administrative process to its end, (2) and then only in defense to a criminal prosecution on a post-induction *habeas corpus,* (3) and even then on only a limited basis, did receive some further elaboration by the lower federal courts. Several courts did in fact allow the limited judicial review permitted under the Court's standards to be carried out in pre-prosecution injunction suits based on the general equity jurisdiction of the federal courts, 28 U.S.C. § 1331. See, e.g., Townsend v. Zimmerman, 237 F.2d 376 (6th Cir. 1956), Tomlinson v. Hershey, 95 F.Supp. 72, 73 (E.D.Pa.1949), Schwartz v. Strauss, 206 F.2d 767 (2nd Cir. 1953) (Concurring opinion, Clark, J.). Cf. Ex Parte Fabiani, 105 F.Supp. 139 (E.D.Pa.1952) (Pre-prosecution habeas corpus). In a highly publicized case in 1967, the Second Circuit permitted pre-prosecution judicial review of a local board's reclassification, pursuant to Selective Service delinquency regulations, from II–S to I–A, of two collegiate undergraduates for participation in the war-protest picketing of another local board. Wolff v. Selective Service Local Board No. 16, 372 F.2d 817 (2nd Cir. 1967). In *Wolff* the court noted that the local board's use of the delinquency regulations usurped the jurisdiction of the federal district courts to adjudicate in criminal prosecution questions pertaining to interference with the operation of the Selective Service System. The court therefore determined the local board's action to be beyond its jurisdiction and therefore within the scope of review established by *Estep*. The court then went on to emphasize the "chilling effect" which the local board's action had on the exercise of First Amendment rights and found that threat to be a sufficient basis for the exercise of equity jurisdiction prior to prosecution for refusal to be inducted. The court further found exhaustion of administrative process to be unnecessary.

Against this background, Congress in 1967 passed § 10(b) (3) of the Selective Service Act, 50 U.S.C. App. § 460(b) (3), which states in pertinent part:

No judicial review shall be made of the classification or processing of any registrant by local boards, appeal boards, or the President, except as a defense to a criminal prosecution * * * after the registrant has responded either affirmatively or nega-

tively to an order to report for induction.

Since its enactment § 10(b) (3) has been judicially elaborated by both the Supreme Court and the lower federal courts so as to permit pre-prosecution judicial review of local board classifications in some circumstances and to deny it in others. The difficult question for this court is where on the spectrum between permissible and impermissible review does the instant case stand.

In Oestereich v. Selective Service Local Board No. 11, 393 U.S. 233, 89 S.Ct. 414, 21 L.Ed.2d 402 (1968), the Supreme Court held that § 10(b) (3) was not a bar to pre-prosecution judicial review of a local board's reclassification. There, the petitioner was a theological student who held a ministerial exemption from the draft. His local board reclassified him I–A pursuant to delinquency regulations for non-possession of his registration certificate. The Supreme Court held that the delinquency regulations could not be used to deprive a registrant of a statutory exemption to which he was unquestionably entitled. The Court did not treat as relevant to its decision the First Amendment facet of the petitioner's case. It did, however, note that where a clearly granted exemption was denied to a registrant and where regulatory provisions alleged to have been the basis for the denial were not grounded upon any governmental interest relevant to the particular registrant's status, pre-prosecution judicial review would be permitted.

In Clark v. Gabriel, 393 U.S. 256, 89 S.Ct. 424, 21 L.Ed.2d 418 (1968), the Court held § 10(b) (3) constitutional, at least on its face and as there applied. The Court refused to permit pre-prosecution review in that case because there existed a question as to the status of the registrant as a conscientious objector, which question necessitated the consideration and weighing of factual data. The Court made it clear that even an allegation of local board conduct violative of the First Amendment would not permit pre-prosecution review where the facts underlying the registrant's status were facts determinable by the board.

■ Oestereich and *Gabriel* left open for consideration far many more questions than they resolved. Anderson et al. v. Hershey et al., 410 F.2d 492 (6th Cir. April 11, 1969) (Opinion per Coffin, J., sitting by designation). See generally O'Neil, Review of Selective Service Reclassifications, 37 Geo.Wash.L.Rev. 536 at 556–563 (March 1969). The Supreme Court answered one such question in Boyd v. Clark, 393 U.S. 316, 89 S.Ct. 553, 21 L.Ed.2d 511 (Jan. 13, 1969) in which the Court affirmed *per curiam* the decision of a three-judge district court that § 10(b) (3) prohibited pre-prosecution judicial review of the constitutionality of the student deferment section of the Selective Service Act. It must be conceded then that even where there are no facts in dispute and the attack is leveled on the constitutionality of the Act, pre-prosecution judicial review may not be granted. For this reason, the broad approach urged by plaintiff's counsel on oral argument that the presence of a plausible claim of constitutional violation taken together with the absence of any fact-weighing problem will allow pre-prosecution review must be rejected. Compare Anderson v. Hershey, *supra,* 410 F.2d at p. 496, n. 11 with Oestereich v. Selective Service Local Board No. 11, *supra* at pp. 239–245, of 393 U.S., 89 S.Ct. 414 (Harlan, J. concurring), Clark v. Gabriel, *supra* at pp. 259–264 of 393 U.S., 89 S.Ct. 424 (Douglas, J. concurring), and Breen v. Selective Service Local Board No. 16, 406 F.2d 636 at 639–643 (2nd Cir. 1969) (Dissenting opinion Feinberg, J.).

■ Several of the Circuits have answered some of the remaining questions in opinions upon which the defense here rests. See, e.g., *Anderson, supra, Breen, supra,* Kolden v. Selective Service Local Board No. 4, 406 F.2d 631 (8th Cir. 1969), Kraus v. Selective Service Local Board No. 25, 408 F.2d 622 (4th Cir. March 13, 1969). Without depreciating or differing with the rationales or results of any of those cases, I believe

that the approach to be taken to cases of this sort is the approach utilized in the *Anderson* case by Judge Coffin. In that case, focusing on the use of the delinquency regulations to reclassify persons holding II–S, I–Y, and III–A deferments, Judge Coffin breathed substance into the distinction between the use of delinquency regulations to reclassify exempted persons to I–A status and their use to reclassify those deferred. That distinction turns on a recognition of the functional relationship between the status of the deferred registrants and the reasons why the delinquency regulations were used to reclassify them. So long as some valid governmental interest within the jurisdiction of the local board is accomplished by the reclassification pursuant to the delinquency regulations, § 10(b) (3) constitutes a bar. The presence or absence of a constitutional claim is irrelevant in the context of these cases, just as the Supreme Court rendered it irrelevant in *Oestereich*. For example, if a registrant holding a II–S deferment went to a private discussion group where he argued against the legality and morality of the Vietnam war, and if he were then reclassified, § 10(b) (3) would be no barrier to pre-prosecution judicial review, not because the registrant's First Amendment rights were inhibited but because the government interest which the local board seeks to protect, that is, the smooth and efficient operation of the System, is in no way infringed so as to justify the invocation of the delinquency procedures.[7] This approach to the availability of pre-prosecution review does narrow the species of cases which can be so reviewed. At the same time, however, it does permit review in a considerable variety of cases. See ironically, e. g., Wolff v. Selective Service Local Board No. 16, 372 F.2d 817 (2nd Cir. 1967); O'Neil, *supra* at p. 563. It in no way, moreover, threatens that

class of cases, clearly reviewable in pre-prosecution suits, in which the local board wrongfully classifies because the board misreads the statute, e. g., Bowen v. Hershey, 410 F.2d 962 (1st Cir. March 26, 1969), Crane v. Hershey, 410 F.2d 966 (1st Cir. May 22, 1969), Carey v. Local Board No. 2, 297 F.Supp. 252, n. 10 (D.Conn. Feb. 13, 1969), or the regulations, e. g., Townsend v. Zimmerman, *supra*.

The application of the *Anderson* approach to the facts of the instant case requires a separation of the two possibile theories upon which the plaintiff proceeds. See note 3, *supra*. Clearly, if the conspiracy between the Peace Corps and Local Board No. 3 can be shown, then the reclassification of plaintiff was beyond the jurisdiction of the local board and totally unrelated to any governmental function for which that board exists. The broad discretion vested in the local boards with respect to occupational deferments can in no way be exercised to enforce the employment policies of some other governmental agency.[8] The purpose for which Selective Service exists, construed as broadly as possible, is nevertheless limited to classification and processing and does not extend to the role of roving censor for the other federal agencies.

The case is more difficult if we assume the "inheritance" theory. Under that theory the board is not only within its jurisdiction in classifying Murray but is properly carrying out its obligation to classify a registrant whose changed status has made him subject to reclassification. To conclude from this, however, that pre-prosecution review is here forbidden is to ignore the unique relationship between Selective Service and all other agencies of government with respect to American males between the ages of 19 and 26. Unlike any other federal or state agency Selective Service

---

7. If I have read Judge Coffin's opinion in *Anderson* correctly, he would not here draw the distinction between exemption and deferment which he draws in *Anderson*.

8. It must be recalled throughout this opinion that plaintiff has alleged that but for the action of the Peace Corps he would have retained or been regranted *pro forma* his II–A occupational deferment.

operates, by its very nature, on every male between those ages. //The issue here is whether the federal courts should, prior to prosecution, be available not only to registrants but also to Selective Service when it is obliged to classify or process a person made available to it by conduct allegedly unlawful and concerning which neither the Service nor the registrants can do anything. In a case like this, complete relief can be obtained only if a court reaches the whole controversy. Certainly, neither of the involved agencies can give to the complaining party the whole relief · he alleges to require. This is what separates this kind of case, which involves the operation of the Selective Service System upon a person made available to it by the allegedly wrongful conduct of another government entity from all the other cases decided under § 10(b) (3). What is important is not that a constitutional claim is asserted and not that the deferment sought is one that the local board has broad discretion to grant or deny, but rather that *only a court* can resolve the problem by unraveling the whole controversy and adjudicating first the question first in line, that is, the allegedly wrongful act of the other government entity and second, the question next in line, that is, the board's classification.

To make pre-prosecution review available in such circumstances is not to interrupt the manpower recruitment program, for here the party seeking review has already refused induction and hence will not be available to the System in any case. Moreover, this is not a very broad category of pre-prosecution cases. In fact, pre-prosecution review would occur only when (1) some governmental entity acts arguably wrongfully toward a person within its power and also subject to Selective Service liability, thus changing the person's status so as to make him

available to Selectice Service; (2) Selective Service then reclassifies him in accordance with his new status and before he can obtain relief either from the original government entity or from a court; (3) he then refuses induction on the ground that but for the original government entity's wrongful act he would not have been available to Selective Service.[9]

■ Finally, such a rule is really nothing more than the exercise in novel circumstances of the traditional power of equity to restore the status quo. To exercise equity power in such circumstances not only benefits the particular plaintiff but also accommodates the Selective Service System by adjudicating at the earliest possible moment what the System must eventually get adjudicated in any event. For these reasons, the defendants' motion to dismiss is denied in this respect also.

### Equity Discretion

■ The defense next contends that no injunction should issue, as a matter of the court's equity discretion because "equity will not enjoin a criminal prosecution." The defense looks to several cases concerning the refusal of federal courts to enjoin state criminal prosecutions even though the statutes or regulations under which those prosecutions are being carried forth may arguably be violative of the Constitution. No lengthy discussion of the various principles which animate the decisions of the Supreme Court in that area is necessary. It must be conceded, for example, that 28 U.S.C. § 2283 is often a bar to such federal injunction suits. It must further be conceded that there. are certain principles which, apart from § 2283, preclude federal injunction suits. However, it must likewise be conceded that there are certain exceptions to the doctrine that

9. Plaintiff's counsel suggested the example of Senator Julian Bond's expulsion from the Georgia Legislature and his then availability to Selective Service. I concur in that example but do not limit this holding to cases involving allegedly unconstitutionally wrongful conduct by the original governmental entity. In my view, for example, a college student expelled from a state university in violation of the procedural regulations of that university and then fastened upon by Selective Service could obtain pre-prosecution judicial review.

equity will not enjoin a criminal prosecution. Such exceptions exist whether the suit is brought in one sovereignty's court against officials of another sovereignty, e. g., Dombrowski v. Pfister, 380 U.S. 479, 85 S.Ct. 1116, 14 L.Ed.2d 22 (1965), or in the courts of a single sovereignty against officials of that sovereignty, e. g., Kenyon v. City of Chicopee, 320 Mass. 528, 70 N.E.2d 241, 175 A.L.R. 430 (1946), Hynes v. Grimes Packing Co., 337 U.S. 86, 69 S.Ct. 968, 93 L.Ed. 1231 (1949), Pacific American Fisheries v. Mullaney, 191 F.2d 137, 13 Alaska 362 (9th Cir. 1951). Such exceptions exist usually because the relief obtainable at law is inadequate. Hence if the plaintiff in a federal equity proceeding cannot vindicate his rights in full or if the court cannot adjudicate in full the controversy in legal proceedings, it is proper for the court to exercise its equity power and enjoin the criminal prosecution. In the instant case, the criminal prosecution sought to be enjoined is proceeding on a necessary assumption of the validity of the local board's classification. It would be incongruous, although admittedly not impossible, for this court to reach the merits of the plaintiff's claim as to the local board's classification but not to reach the merits as to the prosecution which follows from the local board's classification. It is only sensible, therefore, in a case where § 10(b) (3) is deemed not to be a barrier to judicial review and where a prosecution is pending which rests upon the classification to be reviewed that relief should encompass the pending prosecution as well as the classification. The motion to dismiss as to the defendants Gallogly and Mitchell is, therefore, in this respect denied.

### The First Amendment

The defense contends that the plaintiff has failed to state a claim upon which relief can be granted because his expulsion from the Peace Corps did not violate the First Amendment. It is argued first that expulsion from employment is not an inhibition on free speech because its only effect is to render the speaker unemployed and not to prohibit him from speaking. It is argued alternatively that even if discharge from employment is an inhibition upon free speech, it is a reasonable inhibition exercised by the Peace Corps to protect an important governmental interest, the apolitical role of the Peace Corps in foreign countries.

The defense's threshold argument concerning the right of the Peace Corps to terminate its employees for exercise of their constitutional freedoms is unrealistic because it fails to account for the "chilling effect" upon speech which is wrought by any governmental action whether it be the imposition of a direct restraint on liberty or property or the removal of a government benefit previously given. Would the defense argue that incarceration of an individual for assertion of political views is not an inhibition on free speech because the speaker can continue to speak as long as he suffers the incarceration?

It is not surprising, therefore, to find that the position taken by the government does not comport with recent decisions of the Supreme Court, e. g., Pickering v. Board of Education, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968); Keyishian v. Board of Regents, 385 U.S. 589, 87 S.Ct. 675, 17 L.Ed. 2d 629 (1967); Wieman v. Updegraff, 344 U.S. 183, 73 S.Ct. 215, 97 L.Ed. 216 (1952), or with recent legal scholarship, e. g., Van Alstyne, The Right-Privilege Distinction in Constitutional Adjudication, 81 Harv.L.Rev. 1439 (1968), Reich, The New Property, 73 Yale L.J. 733 (1963), Note: Unconstitutional Conditions, 73 Harv.L.Rev. 1595 (1963). Generically speaking, it is now settled that simply because the government grants a "privilege" or extends to its citizens the opportunity to exercise their freedom to pursue employment by seeking employment with it, does not mean that the government can attach conditions to the grant of the privilege or the offering of the opportunity, which conditions are

inhibitory of constitutional rights, unless the conditions bear some reasonable relationship to the government interest underlying the privilege granted or the employment opportunity offered. Moreover, even if the attached conditions do bear some relationship, it remains for the court to assess the reasonableness of the conditions by balancing the inhibition on free speech against the governmental interest and the means by which the governmental interest is protected. While due regard must be given in such an assessment to the "paramountcy of First Amendment values," Street v. State of New York, 394 U.S. 576, 89 S.Ct. 1354, 22 L.Ed.2d 572 (Fortas, J., dissenting), it is by no means certain that the balance should always tip in the direction of the speaker unless a "clear and present danger" can be shown to the governmental interest. See Comment, Less Drastic Means and the First Amendment, 78 Yale L.J. 464 at 466–467, nn. 14–16 (1969). The balancing test may, for example, supply a consistency of its own, a consistency which is developable and refinable by case law analysis. Compare, e. g., O'Brien v. United States, 391 U.S. 367, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968) with Street v. State of New York, *supra*. In any case, whatever may be the standard to be applied in the balancing process, it is certain that the volunteer employee status of the plaintiff Murray and the fact that he served at the pleasure of the Peace Corps Director is not, in and of itself, nearly sufficient to remove his speech from the ambit of First Amendment protection.

It therefore remains to be considered whether the inhibition on free speech is here justifiable as a reasonable means of protecting a valid governmental interest. There can be no question that the interest which the government seeks to protect is a valid one. The plaintiff here has not been heard to contend to the contrary. Indeed, the plaintiff here concedes that the protection of the apolitical role of the Peace Corps is a commendable concern of the Corps. Neither does the plaintiff here attack on its face the regulatory policy which permits the termination of Peace Corps Volunteers for interference with host country politics. Rather, the plaintiff's attack is leveled upon the regulations and personnel policy of the Peace Corps as applied to him. Hence, it can be conceded that in some circumstances the Corps' interest in remaining apolitical with respect to host country politics can reasonably be protected by termination or transfer policies narrowly applied so as to forbid the feared intrusion. For example, a Peace Corps member who insisted on public polemicizing in the host country concerning the corruption of the host country's present government and the consequent need for its overthrow could properly be subject to expulsion, although such hortatory speech might well be protected if exercised by a United States citizen with respect to his own government. Cf. Herndon v. Lowry, 301 U.S. 242, 57 S.Ct. 732, 81 L.Ed. 1066 (1937). The instant case, however, is a substantially different matter. Murray here wrote a thoughtful letter [10] in measured tones

---

10. "June 5, 1967
Concepcion, Chile

Dear Sir,

I am writing this letter in regard to the recent directive read to me, which has been issued about the right of Peace Corps Volunteers to dissent in the realm of the United States government's international policies. As I understand it, we are not allowed, as Peace Corps Volunteers and hence representatives of the U.S. government, to express opinions contrary to U.S. policy either in speech or writing. This applies in particular to a recent petition circulated among PCVs

in Chile asking for a halt to the bombing in Viet-Nam and a beginning to negotiations, which was destined to be printed in the New York Times if a certain number of signatures could be obtained.

The directive from the Peace Corps, which had to be transmitted to volunteers orally for fear of having it printed and the possibility that it could be read by anyone besides a PCV, states that if a volunteer finds this policy erroneous, he should resign, and if he does not resign, appropriate measures will be taken. Presumably, the appropriate measures are ejection from the Peace Corps. I, for one,

dealing with two matters, one of which, i. e., the policy of the Peace Corps with respect to the right of Volunteers to speak out on public issues, had no connection whatever with host country politics and the other of which, i. e., Peace Corps' policy toward Volunteers' expressions of views on the Vietnam conflict, bore only tangentially, if at all, on the apolitical role of the Peace Corps in Chilean politics. The more reasonable view of this case is that Murray spoke about matters of vital interest to him as a human being, a United States citizen, and a Peace Corps Volunteer. Any inhibition on speech so far removed from the government interest alleged to support it must fall. It is no different than the use of termination from a teaching position in the public schools as a restraint on expressions about school policies differing from those of the school "establishment". See Pickering v. Board of Education, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968). Nor is it substantially different than the use of a loyalty oath or of internal legislative disciplinary procedures to expel a duly elected state legislator for expressions of opinion concerning public issues vital to and deeply felt by him, his race, and the nation at large. See Bond v. Floyd, 385 U.S. 116, 87 S.Ct. 339, 17 L.Ed.2d 235 (1966). To permit a termination such as this would be to value bureaucratic paranoia over the central commitment of the First Amendment to "uninhibited, robust, and wide-open" debate on public issues. New York Times Co. v. Sullivan, 376 U.S. 254 at 270, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964). If such a valuation were accepted, then no person in any branch of the government service which touches upon the foreign policy of the United States could make public statements critical of any facet of foreign policy without fear of compelled severance from the service. The First Amendment prohibits such a broad infringement. The defendants' motion to dismiss is therefore in this respect also denied.

## The Fifth and Sixth Amendment Claims

The plaintiff asserts in conclusory allegations that his expulsion from the Peace Corps violated his Fifth and Sixth Amendment rights. The defense asserts

---

do not accept this policy, but I will not resign. I am prepared to meet the consequences.

I wish to make clear in my letter my reasons for rejecting this policy. First, in regard to politics, I completely agree that the volunteer should not meddle in the politics of the host country, but I do not feel that this applies to the international politics of the U.S. which may be of interest to the host country. The volunteer although a representative of and paid by the U.S. government, does not, upon entrance into the Peace Corps, automatically forfeit any of his rights under the First Amendment. Nor does any other employee of the U.S. government forfeit such rights. Furthermore, working for the U.S. government does not put the employee under any obligation to guard his silence in respect to a government policy with which he does not agree. Also, the First Amendment does not restrict a person from using the position in which he is employed, be it PCV or any other form of employment, on a petition or any other form of protest.

Part of the job of a PCV is to give an opportunity to citizens of a foreign country to know an American citizen in all the varied aspects of his personality including his thoughts on important issues. The better understanding that can result from this interchange of ideas can be a great factor in leading to peace in the world. I find it a contradiction for the Peace Corps to try to suppress any part of the personality of the volunteer, and I shall not tolerate any such suppression.

In conclusion, I wish to state that I continue to oppose the war in Viet-Nam, both as an individual and as a PCV. I do not want my name stricken from the petition I have signed, and I am prepared to sign others in what may be the vain hope that some form of protest can lead quickly to a peaceful conclusion to a cruel, and in my opinion, unjust war.

The following statement by William Douglas is, I think, an apt closing to this letter:

'There is no free speech in the full meaning of the term unless there is freedom to challenge the very postulates on which the existing regime rests.'

Bruce Murray
Peace Corps Volunteer
Concepcion, Chile"

in an equally conclusory fashion that procedural protections guaranteed by the Bill of Rights are not applicable to administrative personnel discharge cases. Each side cites a single case in support of its position with respect to constitutional procedural requisites in administrative personnel discharge cases. A reading of the respective cases makes clear only that a matter of this sort requires a meticulous consideration of the facts and circumstances of each case. Cafeteria & Restaurant Workers Union, Local 473, A.F.L.–C.I.O. v. McElroy, 367 U.S. 886, 81 S.Ct. 1743, 6 L.Ed.2d 1230 (1961); Greene v. McElroy, 360 U.S. 474, 79 S.Ct. 1400, 3 L.Ed.2d 1377 (1959). It cannot be contended either that due process *never* requires notice, a hearing, confrontation, and right to cross-examine, or that it *always* requires such procedures. The truth lies between those extremes. See In Re Gault, 387 U.S. 1, 87 S.Ct. 1428, 18 L.Ed.2d 527 (1967). Because of the detail required by a ruling of this sort, I treat the defense's Rule 12(b) motion to dismiss as a motion for a more definite statement under Rule 12(e). If the plaintiff chooses to pursue his due process claims, he may file an amended complaint within ten days from the date of the filing of this opinion. The defense may then, if it so chooses, raise the legal sufficiency of the plaintiff's complaint. If no amended complaint setting out the specifics of the plaintiff's due process claim is so filed, the court will then entertain a renewed motion to dismiss. The defendants' motion to dismiss is treated as a motion for more definite statement and is in this respect granted. Plaintiff has ten days in which to file an amended complaint.

### Count II

Count II seeks declaratory and injunctive relief against (1) the Rhode Island State Director of the Selective Service System, (2) Rhode Island Selective Service Local Board No. 3, (3) the Attorney General of the United States, and (4) the United States Attorney for the District of Rhode Island. Jurisdiction is alleged on the basis of 28 U.S.C. § 1331 and/or 28 U.S.C. § 1361.

The facts are as follows.[11] After his termination from the Peace Corps in late spring or early summer of 1967 and after his reclassification from II–S status to I–A status, plaintiff Murray requested an occupational II–A deferment from Local Board No. 3 on the ground that the University of Concepcion, where he had taught as a Peace Corps Volunteer, had offered him continued employment as a music teacher notwithstanding his expulsion from the Peace Corps. On September 11, 1967 Murray received from Local Board No. 3 a notice that his appellate request for occupational deferment had been rejected by the Rhode Island Selective Service Appeals Board and a notice to report for induction on October 4, 1967. On September 26, 1967, after consultation with Melvin Wulf, Esq. concerning his status as a conscientious objector, Murray requested from Local Board No. 3 a Selective Service System Form No. 150 conscientious objector application. On September 27, 1967 Murray requested a teacher and spiritual advisor whom he had known in California to file a statement with Local Board No. 3, and on September 29, 1967 Murray filed his application for exemption as a conscientious objector. Shortly thereafter, Local Board No. 3 refused to reopen plaintiff's classification and to consider on its merits his application for conscientious objector status. Sometime thereafter, plaintiff refused to submit to induction and was then indicted for violation of 50 U.S.C. App. § 462 of the Selective Service Act.

Plaintiff Murray further alleges and argues that Local Board No. 3 wrongfully refused to reopen his classification in violation of the Selective Service Act and of the Regulations promulgated thereunder, that Local Board No. 3 denied his conscientious objector claim without any rational basis in fact, and

11. See note 1, supra.

that both such wrongful acts were motivated by the constitutionally offensive purpose of subjecting plaintiff to punishment for his previous assertions of his First Amendment rights of free speech.

The defense has moved to dismiss on the following grounds: (1) as to all the defendants, 28 U.S.C. § 1331 cannot be a basis for jurisdiction because the requisite $10,000 jurisdictional amount is lacking; (2) as to all the defendants, 28 U.S.C. § 1361 cannot be a basis for jurisdiction because mandamus jurisdiction cannot be a basis for the compulsion of a discretionary act; (3) as to all the defendants, 50 U.S.C. App. § 460(b) (3), § 10(b) (3) of the Selective Service Act, is a bar to the exercise of the court's jurisdiction; (4) as to the defendants Mitchell and Gallogly, equity jurisdiction, even if existent and otherwise exercisable ought not, as a matter of discretion, to be exercised, because "equity will not enjoin a criminal prosecution"; (5) as to all the defendants, the complaint fails to state a claim upon which relief can be granted.

### 28 U.S.C. § 1331

With respect to the requisite jurisdictional amount, it is important to note that the procedural right which plaintiff here claims to have been denied was a procedural right to consideration of a statutory substantive claim, 50 U.S.C. App. § 456(j), which arguably may be a legislative statement of a status required by the Constitution. See United States v. Seeger, 380 U.S. 163, 85 S.Ct. 850, 13 L.Ed.2d 733 (1965), Sisson v. United States, 297 F.Supp. 902 (D.Mass. 1969). Hence, for the reasons stated with respect to jurisdictional amount in Count I, I cannot agree that the loss to plaintiff here does not exceed $10,000. The defendants' motion to dismiss is therefore in this respect denied.

### 28 U.S.C. § 1361

With respect to the availability of 28 U.S.C. § 1361 as a basis for jurisdiction, here, as in Count I, if plaintiff is correct in his assertion that Local Board No. 3 was obliged to reopen and consider his claim for conscientious objector status, then, because Local Board No. 3 would have exceeded its regulatory authority, mandamus would be an appropriate jurisdictional basis. See Carey v. Selective Service Local Board No. 2, supra.

### Merits

For purposes of clarity, because the jurisdictional holding as to § 10(b) (3) rests on the court's view of the merits, I will treat here the basis for the plaintiff's reopening claim. It is now established that the discretion vested in local boards with respect to reopening, 32 C.F.R. § 1625.2, is limited by the statutory, 50 U.S.C. App. § 456(j), and constitutional, see United States v. Seeger, 380 U.S. 163, 85 S.Ct. 850, 13 L.Ed.2d 733 (1965), United States v. Sisson, 297 F.Supp. 902 (D.Mass.1969), status accorded to conscientious objectors. United States v. Gearey, 368 F.2d 144 (2nd Cir. 1966). Hence, where a registrant brings facts to a local board concerning his status as a conscientious objector which facts were not considered when the registrant was classified, and which facts make out a *prima facie* case, the local board *must* reopen the registrant's classification unless the facts, if true, would not justify a change in the registrant's status. The point in time at which the registrant brings such facts to the board, even if it be after the issuance of an order to report for induction, is not, in and of itself, a sufficient basis for a board's refusal to reopen the registrant's classification. *Gearey, supra.* Timing may, however, be a relevant factor in the board's determination concerning the sincerity of the objector's claim. United States v. Stoppelman, 406 F.2d 127 at 131 n. 7 (1st Cir. 1969).

The application of these standards to the instant case reveal a clear violation of the regulatory procedures. Here plaintiff submitted a claim for conscientious objector status which claim satisfied the *prima facie* requirement. See Miller v. United States, 388 F.2d 973

at 976 (9th Cir. 1967). Obviously, the facts presented were not considered when plaintiff's classification was made in the summer of 1967. Unquestionably, moreover, the facts plaintiff stated, if true, would have entitled him to conscientious objector status. See United States v. St. Claire, 293 F.Supp. 337 (E.D.N.Y.1968). Hence, Local Board No. 3 was required by law to reopen plaintiff's classification and to consider the merits of his claim with all of the usual regulatory procedures operative. 32 C.F.R. § 1625.13. Accordingly, the defendants' motion is in this respect also denied.

### 50 U.S.C. App. § 460(b) (3)

█ Although there has been considerable litigation concerning the reopening obligation of the local boards of the Selective Service System, I have been unable to find a single case which considers the question of the availability of pre-prosecution judicial review when a clear violation of the reopening regulations is alleged by the registrant. However, the favorable citation by the majority of the Court in Oestereich v. Selective Service Local Board No. 11, 393 U.S. 233, 89 S. Ct. 414, 21 L.Ed.2d 402 (1968), of an older Sixth Circuit decision, which permitted pre-prosecution review where a local board failed to honor the appeals regulations, Townsend v. Zimmerman, 237 F.2d 376 (6th Cir. 1956), indicates that pre-prosecution review is available when the boards exceed their regulatory strictures. It is pivotal, in this context moreover, to recall that 32 C.F.R. § 1625.2, as narrowed by 50 U.S.C. App. § 456(j), is mandatory upon the local boards. See Bowen v. Hershey, 410 F.2d 962 (1st Cir. March 26, 1969). Nor is there any weighing of facts here which would bring this case within the principle of Clark v. Gabriel, 393 U.S. 256, 89 S.Ct. 424, 21 L.Ed.2d 418 (1968), for there is no question that plaintiff submitted a completed conscientious objector application to Local Board No. 3 which brought him well past the *prima facie* threshold. For these reasons it is not surprising to find a case of pre-Oester-

eich vintage which is nevertheless wholly applicable to this situation. In Estep v. United States, 327 U.S. 114, 66 S.Ct. 423, 90 L.Ed. 567 (1946) the Court stated:

> If a local board refused to reopen on the written request of the State Director a registrant's classification and refused to cancel its order to report for induction it would be acting in the teeth of the regulations. In all such cases its action would be lawless and beyond its jurisdiction.

It should be noted, finally, that plaintiff has alleged that Local Board No. 3 refused to reopen, not on any substantive basis, but only in order to punish plaintiff for his previous First Amendment assertions. This allegation buttresses plaintiff's claim of regulatory lawlessness by bringing it close to the category of cases described by Mr. Justice Douglas in *Oestereich* as clearly reviewable in a pre-prosecution equity suit:

> It is no different in constitutional implications from a case where induction of an ordained minister or other clearly exempt person is ordered * * * to retaliate against the person because of his political views.

For all of these reasons pre-prosecution review is available in the circumstances here stated. The defendants' motion to dismiss is therefore denied in this respect also.

### Equity Discretion

For the reasons stated with respect to equity jurisdiction in Count I, I decline to stay my hand from the exercise of equity power to enjoin this criminal prosecution. The defendants' motion to dismiss is denied in this respect also.

### Summary—Motion to Dismiss

The defendants' motion to dismiss is denied in every respect, execpt that as to the plaintiff's Fifth and Sixth Amendment claims in Count I, the motion is treated as one for more definite statement and is granted.

## MOTION FOR PRELIMINARY INJUNCTION

Fed.R.Civ.P. rule 65(a) (2) permits the trial court to order the hearing on the merits of the case to be advanced and consolidated with the hearing on the application for preliminary injunctive relief even after the commencement of the hearing on the application.  I, therefore, decline to pass on the request for preliminary injunctive relief but order the advancement of this case to a position of priority for immediate trial on a date mutually acceptable to the court and the parties.